Samuel H. Park (SBN: 261136)
LAW OFFICE OF SAMUEL H. PARK, APC
148 Pacific Ave., #2
Pacific Grove, CA 93950
Phone: (831) 529-5955
Email: sam@sampark.lawyer

Attorney for Plaintiffs.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUSHANAH HOLLAND, individually and as successor in interest to JERAIE CROMARTIE, a deceased minor; and J.P., a minor child by and through his guardian ad litem, RAUSHANAH HOLLAND. | Case No. |
| | **COMPLAINT FOR DAMAGES** |
| | DEMAND FOR JURY TRIAL |

Plaintiffs,

v.

COUNTY OF RIVERSIDE, a public entity;
EVELIA GARCIA, an individual;
MARIE JULIAN, an individual;
NANCY SOUZA, an individual;
JENNIFER HATHAWAY, an individual;
KATHY LOWE, an individual;
KAREN ROMERO, an individual;
LAVONZA SANDERS, an individual;
AMANDA ROBLES, an individual;
KARIMA DEADRICK, an individual;
STEVE CORDOVA, an individual;
ANDREA SIMON, an individual;
HEIDI THRONE, an individual;
ALAINA RANSOME, an individual;
DEIDRE BURNETT, an individual;
MICHELLE MORRIS-KERIN, an individual;
EDWARD KERIN, an individual;
LIFEPLAN CHILDREN'S SERVICES, INC., a California corporation, and
DOES 1-10, inclusive,

Defendants.

COMPLAINT FOR DAMAGES

**JURISDICTION**

1.      The Court has original jurisdiction over the claims alleged herein because they arise under the Fourth and Fourteenth Amendments to the United States Constitution.

2.      Pursuant to 28 U.S.C. section 1367(a), the Court also has supplemental jurisdiction over the state law claims herein, which are so related to the vindication of constitutional rights that they form the same case or controversy.

**VENUE**

3.      Venue is proper in this judicial district because all defendants are residents of California and the events or omissions giving rise to Plaintiff's claims occurred in the County of Riverside, State of California.

**PARTIES**

4.      Plaintiff RAUSHANAH HOLLAND ("Raushanah")

5.      Plaintiff, J.P., is a minor child who at all times relevant resided in the County of Riverside. At the time of the alleged events, J.P. was one years old.

6.      Plaintiff, JERAIE CROMARTIE ("Jeraie"), is a deceased minor bringing the within claims through her successor-in-interest, RAUSHANAH HOLLAND ("Raushanah"). At the time of the alleged events, Jeraie was seven (7) years old and a resident of the County of Riverside.

7.      Defendant, COUNTY OF RIVERSIDE ("COUNTY") is a political subdivision of the State of California. The Riverside County Department of Public Social Services (DPSS) is an administrative subdivision of the COUNTY, charged with providing child welfare services throughout the County of Riverside.

8.      Defendant, EVELIA GARCIA ("GARCIA"), is an individual who at all times relevant to this Complaint was employed by COUNTY as a social worker in emergency response and acted under of color of state law in committing the acts and omissions alleged herein.

9.      Defendant, MARIE JULIAN ("JULIAN"), is an individual who at all times relevant to this Complaint was employed by COUNTY as a social worker supervisor to

GARCIA and acted under of color of state law in committing the acts and omissions alleged herein.

10.     Defendant, NANCY SOUZA ("SOUZA"), is an individual who at all times relevant to this Complaint was employed by COUNTY as a social worker and acted under of color of state law in committing the acts and omissions alleged herein.

11.     Defendant, JENNIFER HATHAWAY ("HATHAWAY"), is an individual who at all times relevant to this Complaint was employed by COUNTY as an investigating social worker and acted under of color of state law in committing the acts and omissions alleged herein.

12.     Defendant, KATHY LOWE ("LOWE"), is an individual who at all times relevant to this Complaint was employed by COUNTY as a social worker supervisor to HATHAWAY and acted under of color of state law in committing the acts and omissions alleged herein.

13.     Defendant, KAREN ROMERO ("ROMERO"), is an individual who at all times relevant to this Complaint was employed by COUNTY as an investigating social worker and acted under of color of state law in committing the acts and omissions alleged herein.

14.     Defendant, LAVONZA SANDERS ("SANDERS"), is an individual who at all times relevant to this Complaint was employed by COUNTY as a social worker supervisor to ROMERO and acted under of color of state law in committing the acts and omissions alleged herein.

15.     Defendant, AMANDA ROBLES ("ROBLES"), is an individual who at all times relevant to this Complaint was employed by COUNTY as a social worker and acted under of color of state law in committing the acts and omissions alleged herein.

16.     Defendant, KARIMA DEADRICK ("DEADRICK"), is an individual who at all times relevant to this Complaint was employed by COUNTY as a social worker supervisor to defendants, ROBLES and HATHAWAY, and acted under of color of state law in committing the acts and omissions alleged herein.

17.     Defendant, STEVE CORDOVA ("CORDOVA"), is an individual who at all times relevant to this Complaint was employed by COUNTY as a social worker supervisor to ROMERO and acted under of color of state law in committing the acts and omissions alleged herein.

18.     Defendant, ANDREA SIMON ("SIMON"), is an individual who at all times relevant to this Complaint was employed by COUNTY as an emergency response social worker and acted under of color of state law in committing the acts and omissions alleged herein.

19.     Defendant, HEIDI THRONE ("THRONE"), is an individual who at all times relevant to this Complaint was employed by COUNTY as an emergency response social worker and acted under of color of state law in committing the acts and omissions alleged herein.

20.     Defendant, ALAINA RANSOM ("RANSOM"), is an individual who at all times relevant to this Complaint was employed by COUNTY as a social worker and acted under of color of state law in committing the acts and omissions alleged herein.

21.     Defendant, DEIDRE BURNETT ("BURNETT"), is an individual who at all times relevant to this Complaint was employed by COUNTY as a social worker supervisor to RANSOM and SIMON and acted under of color of state law in committing the acts and omissions alleged herein.

22.     Collectively, Defendants, GARCIA, JULIAN, SOUZA, HATHAWAY, LOWE, ROMERO, SANDERS, ROBLES, CORDOVA, SIMON, THRONE, RANSOM, and BURNETT, shall be referred to herein as INDIVIDUAL COUNTY DEFENDANTS.

23.     Defendant, MICHELLE MORRIS-KERIN ("MORRIS-KERIN"), is an individual who at all times relevant to this Complaint was a resident of the County of Riverside.

24.     Defendant, EDWARD KERIN ("KERIN"), is an individual who at all times relevant to this Complaint was a resident of the County of Riverside.

- 4 -

COMPLAINT FOR DAMAGES

25.     Defendant, LIFEPLAN CHILDREN'S SERVICES, INC. ("LIFEPLAN"), is a California corporation with its principal place of business in Riverside County, California. Plaintiffs are informed and believe, and on that basis allege, that LIFEPLAN is, at all times relevant was, owned and operated by MORRIS-KERIN and KERIN. Plaintiffs are informed and believe, and thereon allege, that LIFEPLAN, MORRIS-KERIN, and KERIN operated the foster family home known as Morris Small Family Home. Wherever in this Complaint, acts or omissions are attributed to MORRIS-KERIN or KERIN, the same is alleged against LIFEPLAN.

26.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, are unknown to Plaintiffs at the present time. Plaintiffs therefore sue said Defendants by such fictitious names and will seek leave of Court to amend this Complaint to set forth the true names and capacities thereof, when the same has been ascertained.

27.     Defendants, and each of them, were and are the agents, servants, representatives, and/or employees of each of the other Defendants, herein, and were at all times acting within the course and scope of such agency, representation and employment and with the permission and consent of each of said Defendants.

28.     Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Defendants, including DOES 1 through 10, inclusive, were at all times herein mentioned, acting in concert with, and in conspiracy with, collaborated in, or participated with each and every one of the remaining Defendants in doing the things alleged in this Complaint.

29.     Wherever appearing in this Complaint, each and every reference to Defendants, and to any of them, is intended to be and shall be a reference to all Defendants hereto, and to each of them, named and unnamed, including all fictitiously named Defendants, unless said reference is otherwise specifically qualified.

## **COMMON FACTS**

30.     Raushanah is the mother of Jeraie (deceased: June 27, 2010) and plaintiff, J.P. As of May 2007, Raushanah was also the mother of child, Jerone Jenkins, who has now reached the age of majority. Pursuant to the laws of intestate succession, including, without limitation, California Probate Code section 6402, subdivision (b), Raushanah is the person who would be entitled to the property of the decedent, Jeraie. Therefore, Raushanah is the appropriate person to bring a cause of action for wrongful death pursuant to California Code of Civil Procedure section 377.60, subdivision (b) and also the appropriate person to bring a survival action on behalf of the Estate of Jeraie pursuant to California Code of Civil Procedure section 377.30.

31.     Jeraie was born with congenital anomalies and throughout her young life suffered symptoms including asthma, cleft palate, coughs, fevers, and a variety of medical issues. Despite these and other significant medical issues, Raushanah took great care to ensure that Jeraie received the medical care that she needed, including surgery and blood transfusions.

32.     On May 22, 2007, Raushanah took her daughter, Jeraie, to Loma Linda University Medical Center (LLUMC) for vomiting and black tar stool. At the time, Raushanah had a lot going on in her life: (1) her family had been evicted from their home, (2) she had a surgery scheduled for May 24, 2007 to terminate a pregnancy, (3) she had no money, and (4) was in the process of moving her family to Las Vegas.

33.     Raushanah stayed with her daughter throughout the evening of the 22nd and returned home on May 23, 2007. Before leaving the hospital, Raushanah informed hospital staff that she would return after her abortion scheduled for May 27, 2007 and securing transportation.

34.     On May 24, 2007, Raushanah spoke with LLUMC nurse. Raushanah informed the nurse that the contact information that the hospital had on file for her was incorrect and provided her new phone number. She informed the LLUMC nurse that she did not have transportation to the hospital and explained that could not go to the LLUMC due to the planned surgery to terminate her pregnancy.

COMPLAINT FOR DAMAGES

35.     Although Raushanah could not go to hospital due to complications with her pregnancy, including severe nausea, and lack of transportation, Raushanah kept in regular contact with LLUMC hospital staff by telephone.

36.     On or about May 27, 2007, DPSS received a referral from LLUMC, alleging that Raushanah abandoned Jeraie at the hospital and that the child was ready to be discharged.

37.     On May 28, 2007, GARCIA spoke with hospital staff, who provided the updated telephone number for Raushanah and the reasons given by Raushanah for her absence at the hospital.

38.     GARCIA failed to make a reasonable effort to contact Raushanah. She purposefully left a voicemail message for Raushanah on an older phone number that she knew as no longer any good. GARCIA then documented in her "Investigation Narrative," which is part of the statewide CWS/CMS system, that "*mother has made no reasonable efforts to contact [DPSS]; her whereabouts and those of the children are unknown.*" At the time said entry was made, GARCIA knew that Raushanah had not even been given notice of the investigation or of the need to contact DPSS and that she had not made reasonable efforts to contact Raushanah to investigate the referral.

39.     That same day, GARCIA and her supervisor JULIAN jointly made the decision to seize all three of Raushanah's children and take them into protective custody and agreed on a plan to seize the children.

40.     On May 28, 2007, at approximately 7:00 p.m., GARCIA informed hospital staff at LLUMC that all three of Raushanah's children were placed into protective custody and provided the hospital social worker with Notice of Hearing and Court Orientation Sheet. GARCIA ordered the hospital social worker to provide the information to Raushanah.

41.     At the time that GARCIA seized Jeraie, the child was under the care of medical professionals and was not in imminent danger of suffering injury or death. GARCIA knew that she had not conducted a reasonable investigation into the facts prior to making the decision to seize Raushanah's children, including, without limitation, by interviewing

Raushanah. In addition, neither GARCIA nor any other DPSS social worker had offered

Raushanah any services which might have eliminated the need to seize the children.

42.     Similarly, neither GARCIA nor JULIAN had any information or evidence in their respective possession suggesting that J.P. was at risk of suffering severe bodily injury within the time it would have taken to obtain a warrant. The only reason why J.P. could not be seized that day was because GARCIA had not yet made contact with Raushanah.

43.     On May 30, 2007, GARCIA and JULIAN filed a Detention Report with the Riverside Juvenile Court that was full of misrepresentations and omissions of material fact.

44.     GARCIA and JULIAN made knowing misrepresentations including that:

a.  GARCIA "provided [Raushanah] with [her] contact information" and that Raushanah "has not made reasonable efforts to contact the Department;"

b.  "On May 25th and 26th, 2007, attempts were made to contact the mother, however, they were unsuccessful."

c.  Raushanah "has an extensive history with Riverside County Child Protective Services due to issues of neglecting her daughter, Jeraie;"

d.  Raushanah "had been provided with Voluntary Family Maintenance Services and she did not complied [sic] with all the components of her case plan;"

e.  Raushanah "has failed to benefit from prior services;"

f.  Raushanah "failed to provide an adequate and safe environment for the children as evidenced by the mother constant home evictions despite receiving financial assistance for the children and prior Voluntary Family Maintenance (FMV) and Family Maintenance Adjudicated (FMA) services;"

g.  Raushanah "abandoned" Jeraie at LLUMC;

h.  Raushanah "has failed to make herself available to provide the child with adequate food, clothing, shelter, and support;"

i.  Raushanah "neglected the developmental needs of Jeraie as evidenced by the mother's failure to follow through with medical treatment, inability to provide stable housing;"

j. That "Reasonable Efforts were made to prevent or eliminate the need for the child(ren)'s removal from the home;" and

k. That Pre-placement Preventative Services were provided but were not effective in preventing or eliminating the need for removal of the child from the home."

45. GARCIA and JULIAN also knowingly concealed exculpatory facts, including:

a. that GARCIA made deficient efforts to contact Raushanah by leaving a voicemail message on a telephone number that she knew was not current, despite receiving Raushanah's current telephone number from the LLUMC hospital social worker;

b. that nobody at DPSS had any information or evidence suggesting that J.P. was at risk of any harm at the hands of Raushanah;

c. that none of the so-called "Pre-Placement Preventative Services" described in the Detention Report were offered or given to Raushanah after the May 27, 2007 referral;

d. that nobody at DPSS, including GARCIA and JULIAN, made any attempt to contact the father of J.P. or any of the children's other relatives; and

e. that nobody at DPSS had reviewed the LLUMC medical records other than the brief summary attached to the Detention Report.

46. Similarly, on May 30, 2007, SOUZA submitted a Juvenile Petition that contained numerous misrepresentations and fraudulent omissions of facts.

47. SOUZA misrepresented that:

a. Raushanah had failed to provide Jeraie "with adequate care and support;"

b. J.P. and his sibling Jerone Jenkins were "at risk of suffering from serious physical harm."

c. Raushanah had "neglected the medical needs of the child, Jeraie."

- 9 -

COMPLAINT FOR DAMAGES

48.     SOUZA also concealed the same facts as GARCIA and JULIAN as mentioned hereinabove, which were known to DPSS at the time of the filing of the Juvenile Petition.

49.     The list of misrepresentations and omission of exculpatory information alleged against the foregoing defendants is based on the information that is presently known to Plaintiffs. Plaintiffs reserve the right to amend this Complaint based on subsequently discovered evidence.

50.     GARCIA, JULIAN, and SOUZA each knew that the misrepresentations in their respective filings. were false at the time made, or, they did not care as to the truth or falsity of said statements and were reckless with the truth.

51.     GARCIA, JULIAN, and SOUZA submitted their respective filings with the intention that the Juvenile Court rely upon the false representations and omissions of fact and order the continued detention of Jeraie as well as the detention of her siblings, Jerone Jenkins and J.P.

52.     On May 31, 2007, the Juvenile Court granted DPSS social workers' requests to continue the detention of Jeraie. The Court also ordered the detention of Jerone Jenkins and J.P., based on the false and unsupported allegation that all three children were at risk of not receiving "adequate food, clothing, shelter, and support."

53.     The Juvenile Court also granted DPSS the authority to determine temporary placement and care of the minor children, including the discretion to place the children in a foster home, licensed facility, or in the home of a relative.

54.     Said orders were made without notice to Raushanah or providing her with an opportunity to be heard. In fact, notice was not given to any of the family members of Jeraie, Jerone, or J.P.

55.     Following the Detention Hearing, responsibility for continuing the investigation and handling of the juvenile case changed from GARCIA and JULIAN to HATHAWAY and LOWE.

56.     Meanwhile, Raushanah continued to remain in contact with LLUMC by telephone. On June 4, 2007, Raushanah went to LLUMC to pick up Jeraie. Hospital staff refused to release Jeraie and called HATHAWAY.

57.     After being informed of DPSS involvement, Raushanah asked why nobody at DPSS called her even though Raushanah had provided her current phone number to LLUMC. According to DPSS records, Raushanah "began asking questions that [HATHAWAY] was presently unable to answer" and the call was transferred to HATHAWAY's supervisor, DEADRICK.

58.     DEADRICK informed Raushanah that protective custody warrants had issued for Jerone and J.P. and ordered her to bring the children to DPSS. Raushanah explained that the children were already en route to their new residence in Las Vegas and would have to be driven back.

59.     When Raushanah questioned why DPSS failed to provide her notice of prior to the issuance of the custody warrants, DEADRICK became irate and refused to give a direct answer. When Raushanah's mother, Audrey Holland, and a maternal aunt-in law, Alicia Graham, offered to take the children, DEADRICK refused and stated that DPSS would contact them later regarding placement.

60.     On June 5, 2007, Raushanah spoke with HATHAWAY and informed her that J.P. was now with his biological father, Terrell Price. On June 6, 2007, Raushanah delivered Jerone to HATHAWAY. The same day, Mr. Price brought J.P. to DPSS, who authorized J.P. to remain with him on the condition that DPSS facilitates contact between J.P. and Raushanah and that Mr. Price submit to a drug test.

61.     On or about June 7, 2007, DPSS social workers placed Jeraie in the home of MORRIS-KERIN and KERIN, a couple with a troubled past, including allegations of abuse and neglect of persons placed in their care. From the point of detention through June 27, 2010, the child remainder under the care of MORRIS-KERIN, KERIN, and COUNTY agents and employees, all of whom owed a heightened duty of care to the child based on their special relationship.

62.     At the time that DPSS placed Jeraie in the home of MORRIS-KERIN and KERIN, they knew or should have known that MORRIS-KERIN and KERIN posed a danger to the children placed in their care and/or failed to conduct a proper investigation into the fitness of the home or services provided to disabled and medically fragile children in their care. Among other things, the County knew or should have known that KERIN and MORRIS-KERIN had a history of complaints, including, but not limited to, accusations of exaggerating medical problems of children in their care to get more money from the state (Munchausen Syndrome by Proxy), of overmedicating, and of physically and sexually abusing children placed in their care. These red flags were ignored.

63.     While in the care of DPSS, MORRIS-KERIN, and KERIN, Jeraie's medical condition quickly deteriorated. At the time of detention, Jeraie was able to crawl, walk while holding onto things, did not require a wheelchair, ate solid foods, and able to self-feed. Jeraie, despite her significant medical challenges, exceeded prior doctors' expectations regarding her health and well-being.

64.     Prior to the detention of Jeraie, for the first seven years of life, the child only needed hospitalization approximately once per year. Yet, after Jeraie's detention from Raushanah, the child had multiple hospital visits, blood transfusions, surgery, developed warts in her mouth and arms, lost mobility and supposedly required a wheelchair, and supposedly needed a g-tube for feeding. Despite Jeraie's alarming decompensation while in the care of MORRIS-KERIN and KERIN, DPSS agents failed to undertake a reasonable investigation into the cause of Jeraie's rapid decompensation, lied to the Court about Jeraie's supposed "improvement" while in foster care, and failed to protect Jeraie.

65.     Plaintiffs are informed and believe that MORRIS-KERIN and KERIN insisted on unnecessary medical procedures and hospitalizations of Jeraie or, alternatively, medically, physically, and sexually abused the child in order to create the need for increasingly expensive medical care to their pockets and satisfy their sick and depraved urge to hurt the vulnerable children placed in their care.

66.     MORRIS-KERIN and KERIN immediately Jeraie from LLUMC and had the child seen by doctors at Rady's Children's Hospital in San Diego or other medical facilities so that the child would no longer be seen by physicians who had a detailed medical history and past experience with the child. Plaintiffs allege on information and belief that MORRIS-KERIN and KERIN had an established pattern of removing especially vulnerable children from the care of medical providers who previously cared for the child so that new doctors would be forced to rely upon MORRIS-KERIN's and KERIN's account of the child's symptoms and requirements for care. Plaintiffs are informed and believe and thereon allege that COUNTY and its agents, based on repeated complaints, knew of this *modus operandi* and failed to conduct a reasonable investigation into the facts.

67.     Within one week of placement with MORRIS-KERIN and KERIN, Jeraie was transported to Rancho Springs Medical Center emergency room and then transferred to San Diego Children's Hospital. On June 15, 2007, MORRIS-KERIN contacted HATHAWAY to make the startling claim that Jeraie was "in the end stages of liver disease" and that the disease was terminal. MORRIS-KERIN claimed that, according to doctors, Jeraie's condition was "deteriorating," that "frequent blood transfusions" would be required, and eventually hospice care would be needed. HATHAWAY and LOWE accepted MORRIS-KERIN's representations at face value and repeated the same information to the Juvenile Court in a Jurisdiction/Disposition Report without verifying the information from Jeraie's medical providers.

68.     After taking custody, MORRIS-KERIN and KERIN also removed Jeraie from her school and began to "homeschool" the child. Plaintiffs are informed and believe and thereon allege that these Defendants did so with the intention of sequestering Jeraie from the scrutiny of other mandated reporters who might see signs of abuse. Plaintiffs allege on information and belief that the removal from school of medically fragile children that MORRIS-KERIN and KERIN decided to abuse to death was also a *modus operandi*.

69.     For the next three years, Jeraie would remain in foster care. Defendants, including ROMERO, SANDERS, ROBLES, DEADRICK, and CORDOVA continued to

prepare false reports to the Juvenile Court with numerous misrepresentations and omissions of material fact to continue the detention of Jeraie. Defendants pressured and threatened Raushanah to give her children up for adoption, but Raushanah steadfastly refused. They also pressured Terrell Price to give up the baby J.P. for adoption, but Mr. Price also refused.

70.     In addition, as alleged in greater detail below, each of the Defendants in this case failed to protect Jeraie from MORRIS-KERIN and KERIN, despite numerous reports of child abuse made against them, by failing to conduct reasonable investigations, by concealing and failing to report the referrals to Raushanah, the Juvenile Court, and to law enforcement, and by failing to provide minimally adequate care to Jeraie up to the moment of her untimely death.

71.     On June 27, 2010, Jeraie deceased due to multiple medical complications after being placed on palliative medical care. Raushanah spent the last years of the child's life helplessly watching as the child deteriorated while in the care of COUNTY, MORRIS-KERIN, and KERIN. Even after the child was determined to be suffering from terminal disease, COUNTY refused to release the child to her mother so that the last moments of her life could be spent with family. Instead, the individually named Defendants herein forced Raushanah to jump through endless hoops and hurdles, including parenting classes, training, and other unnecessary requirements in an effort to prolong the detention of Jeraie and keep the money flowing.

72.     On or about August 24, 2021, Raushanah discovered through a social media post on Instagram that MORRIS-KERIN and KERIN were indicted by a grand jury in Riverside County for crimes including murder, child endangerment, and sex crimes against persons placed in their care. Raushanah was horrified by this discovery, ***particularly as County never informed her of the indictment***.

73.     Until the discovery of the indictment, Raushanah had no reason to suspect that the County had failed to supervise MORRIS-KERIN and KERIN, failed to supervise their care of Jeraie, and failed to protect Jeraie from mistreatment and death at the hands of MORRIS-KERIN and KERIN. In fact, all along, Defendants assured Plaintiffs and the

Juvenile Court that Jeraie's medical decline was natural and that Jeraie received good care from MORRIS-KERIN and KERIN.

74.   Plaintiffs are informed and believe and thereon allege that DPSS intentionally failed to notify *any* of the parents and families of children placed in the home of MORRIS-KERIN and KERIN, regarding the criminal indictment, despite having the legal duty and moral obligation to do so.

75.   On August 9, 2021, the Riverside County District Attorney announced that a criminal grand jury returned a 14-count indictment against MORRIS-KERIN and KERIN, on a variety of charges including murder, child endangerment likely to cause great bodily injury or death, dependent adult endangerment likely to cause great bodily injury or death, and lewd acts on a dependent adult. It was alleged that MORRIS-KERIN caused the death of a foster child in her care through medical abuse and neglect.

76.   Plaintiffs are informed and believe that the parents of the other deceased child filed a civil suit against COUNTY, MORRIS-KERIN, and KERIN for violation of CANRA, wrongful death, survival action, breach of duty arising under special relationship, failure to discharge mandatory duties, and violation of civil rights, in a suit entitled, *Angel Ramirez v. County of Riverside, et al*. In their complaint, the plaintiffs allege between 1998 and May 2018, MORRIS-KERIN and KERIN were the subject of *more than 25* reports of physical abuse, sexual abuse, and neglect.

77.   On or about September 30, 2021, Raushanah requested a complete copy of Jeraie's juvenile case file. What she received was woefully inadequate and incomplete. She only received a few minute orders and court reports, comprising only *111 pages*. COUNTY did not provide Raushanah with a complete copy of the juvenile case file, despite the fact that Raushanah is the parent of the deceased minor and entitled to the complete file pursuant to California Welfare & Institutions Code § 827 and California Rule of Court 5.552. There was no basis, whatsoever, for refusing to produce the entire file.

78.   Records that were obviously missing include, but are not limited to: the Delivered Service Logs, medical records, hearing transcripts, social worker notes, the SCAR

report, safety assessments, risk assessments, and other records that are part of the CWS/CMS system. The failure to provide Raushanah, who is the mother of the deceased child, with a complete copy of her child's file was unlawful and violated Raushanah's rights under Welfare & Institutions Code §827.

79.     As detailed below, Raushanah is informed and believes that the failure to do so was motivated by the bad faith desire to continue to conceal the true facts of Jeraie's abuse at the hands of MORRIS-KERIN and KERIN and the cause of death from Raushanah. Among other reasons, as alleged further below, the failure to provide a complete copy of Jeraie's juvenile case file was to continue the concealment of no fewer than **four** reports of suspected child abuse in the home of MORRIS-KERIN and KERIN that ***specifically involved Jeraie.***

80.     On January 31, 2022, Raushanah filed a Government Claim, together with an Application for Leave to Present Late Claim because she now had reason to suspect that the County of Riverside may be responsible for an untimely death of her child, based on the criminal prosecution of MORRIS-KERIN and KERIN.

81.     On or about February 8, 2022, the County of Riverside served a Notice of Return of Claim as Untimely and Notice of Denial of Application to Present Late Claim.

82.     Notwithstanding, Plaintiffs' filing of the Government Claim, it is alleged herein that Plaintiffs are excused from any and all noncompliance with the claims presentation statutes because of the conduct of Defendants in perpetrating fraud, concealing evidence, and threatening Plaintiffs as alleged hereinbelow.

83.     On April 1, 2022, Plaintiffs' counsel, Samuel H. Park, filed a Request for Disclosure of Juvenile Case File, seeking an unredacted copy of the entire juvenile case for Jeraie. Plaintiffs' counsel also specifically requested that the names of J.P. and Jerone Jenkins not be redacted and provided notice of the request to J.P. and Jerone Jenkins. Counsel attached a copy of the Government Claim and Application to File Late Claim to the Request for Disclosure.

COMPLAINT FOR DAMAGES

84.     On April 19, 2022, Mr. Park received a telephone call from Laurie Burns, an attorney purporting to represent the deceased minor, Jeraie. When Mr. Park informed Ms. Burns that her client was deceased and questioned her role in the hearing, Ms. Burns stated that she would research the issue and follow up with Mr. Park. She never did.

85.     On May 25, 2022, the Riverside Juvenile Court held a hearing on counsel's Request for Disclosure. At the hearing, Plaintiffs' counsel learned that an ex parte application had been filed, without notice to Plaintiff's counsel, to appoint Ms. Burns as counsel for the deceased minor, Jeraie.

86.     Ms. Burns, admitted that she could not represent the deceased child but nonetheless asserted an objection to the release of any juvenile case files for J.P. or Jerone Jenkins on the grounds that the Judicial Council form stated that only Jeraie's records were sought and that the names of her siblings should be redacted. County Counsel for the County of Riverside also objected on the same grounds.

87.     On May 27, 2022, the Juvenile Court entered an order that the "entire juvenile case file" be released to Plaintiff's counsel, but that redactions must be made for, among other things, the "name, address, and other identifying information of care providers" and "unrelated children's names and information."

88.     Without waiting for the Court's order, Plaintiffs' counsel immediately filed separate Requests for Disclosure of Juvenile Case Files for Jerone Jenkins and J.P. on May 25, 2022. As of the date of this Complaint, the Juvenile Court has not set a hearing or made any orders regarding disclosure of the records of Jerone Jenkins or J.P.

89.     On or about June 24, 2022, DPSS produced a heavily redacted copy of the juvenile records for Jeraie. DPSS did not provide a privilege log or any other means of identifying the basis for the redactions, which included numerous blacked out paragraphs. The records that were produced were a whopping *1,499 pages*. Recall that when Raushanah sought the records, which arguably should be more complete than information provided to her counsel, she received only *111 pages*.

90.     After reviewing the records, it was evident that DPSS still had not provided counsel with a complete copy of the juvenile case file. There are still missing Delivered Service Logs, attachments and exhibits to reports, custody warrants, etc. These deficiencies will need to be addressed through the Disclosure and Discovery process, as it is evident that an order from the District Court will be required to compel disclosure of information needed for the full and fair litigation of Plaintiffs claims.

91.     Based on the limited juvenile records received, Plaintiffs learned **for the very first time** that DPSS received **at least four** reports of suspected child abuse against Jeraie at the hands of MORRIS-KERIN and KERIN. **Every single one of the reports was concealed from Raushanah and from the Juvenile Court. Defendants also failed to cross-report the allegations of abuse to law enforcement and to the District Attorney's Office.**

92.     Plaintiffs are informed and believe, and thereon allege, that these referrals are just the tip of the iceberg and that DPSS agents were aware of numerous other reports concerning suspected child abuse in the home of MORRIS-KERIN and KERIN throughout their extensive relationship with the foster home.

93.     After reviewing the records released on or about June 24, 2022, Plaintiffs learned the following:

**2/20/2009 Report of Child Abuse in the home of MORRIS-KERIN and KERIN**

94.     On February 20, 2009, DPSS received a referral concerning suspected child abuse in the home of MORRIS-KERIN and KERIN. The reporting party, who was a staff member in the foster home, reported that MORRIS-KERIN was feeding all of the children "shakes, no food, water, or nutrition." The reporting party also stated that two of the children, including Jeraie, were fed through a g-tube. The reporting party stated that when any of the nursing staff was caught attempting to feed the children regular food, MORRIS KERIN "got mad and stopped them."

95.     THRONE, who was assigned to investigate the referral, failed to perform a reasonable investigation. She closed out the referral as "unfounded."

96.     Nobody informed Raushanah about this referral or brought the existence of referral to the attention of the Juvenile Court. It was purposefully concealed and suppressed by all defendants.

**8/27/2009 Report of Child Abuse in the home of MORRIS-KERIN and KERIN**

97.     On August 27, 2009, DPSS received a referral from a physician at Rady Children's Hospital in San Diego with the concern that two children, including Jeraie, were at risk. The physician was concerned that a child seen on August 19th, for whom he had no immediate concerns, was, according to MORRIS-KERIN and KERIN, suddenly having symptoms that required emergency care. Despite the physician's order to bring the child in, MORRIS-KERIN and KERIN did not take the child into the hospital.

98.     Although the referral mainly consisted of concerns regarding the other child, was evident that the physician at the hospital was deeply concerned about Jeraie's well being in the home based on his or her concerns regarding MORRIS-KERIN and KERIN.

99.     An intake specialist contacted the school district, and, like Jeraie, this other child was also removed from school by MORRIS-KERIN and KERIN since the first day of school.

100.     This referral was "evaluated out" without any investigation by DPSS.

101.     Nobody informed Raushanah about this referral or brought the existence of referral to the attention of the Juvenile Court. It was purposefully concealed and suppressed by all defendants.

**2/20/2009 Report of Child Abuse in the home of MORRIS-KERIN and KERIN**

102.     On October 16, 2009, DPSS received a report of suspected child abuse in the home of MORRIS-KERIN and KERIN. According to the Emergency Response Referral, "this is the 3rd referral received in the past year. … there were numerous allegations regarding disabled adults in the home."

103.     The reporting party, believed to be a nurse, reported that Jeraie was put on a g-tube and it was only supposed to be temporary and for supplemental reasons. The reporting party stated that the doctor ordered that Jeraie still be fed, but MORRIS-KERIN ordered staff

to not feed Jeraie and only give her shakes. Then, MORRIS-KERIN ordered that Jeraie remain permanently on the g-tube and fed solely through the g-tube. Further, when CPS began an investigation into the g-tube, MORRIS-KERIN obtained doctors order that Jeraie remain solely on the g-tube, but that MORRIS-KERIN had forced Jeraie to eat solely through the g-tube long before the doctor changed the recommendations.

104.    The reporting party further disclosed that Jeraie "would sometimes get out of her bed and crawl to the bathroom and tug on the shower curtain, trying to get some water to drink." As a result, MORRIS-KERIN forced Jeraie to sleep in the living room to cut off the child's access to water. The reporting party disclosed that MORRIS-KERIN directed staff to keep a bed in Jeraie's room "so that no one questions it."

105.    The reporting party also stated that MORRIS-KERIN ordered staff to "*alternate the medications without a doctor's order*" and, referring to herself, "*has made the comment before that 'Dr. Michelle was here'*."

106.    Reporting party also suspected that MORRIS-KERIN and KERIN "*would increase Jeraie's pump to a very high rate, which caused her to have extreme stomach problems*."

107.    The reporting party also disclosed that Jeraie was often left sitting in her own feces until her nurse came to change and shower her.

108.    On the Emergency Response Referral Information document, eight (8) entries in the Referral History were completely redacted without explanation.

109.    The October 16, 2009 referral was investigated by SIMON and BURNETT, who did not perform a reasonable investigation. SIMON closed out said referral as "unfounded," despite learning that the doctors' orders upon which MORRIS-KERIN and KERIN relied upon were stale and based on the purported need for a swallow study that had not been competed for more than half a year.

110.    Nobody informed Raushanah about this referral or brought the existence of referral to the attention of the Juvenile Court. It was purposefully concealed and suppressed by all defendants.

**10/17/2009 Report of Child Abuse in the home of MORRIS-KERIN and KERIN**

111.     The following day, on October 17, 2009, DPSS received another referral for child abuse taking place in the home of MORRIS-KERIN and KERIN. The reporting party stated that MORRIS-KERIN, as a form social worker, knew how to "work the system." Among other things, the reporting party stated that MORRIS-KERIN forced Jeraie to sleep in the living room because she did not want the child to drink anything, even though the doctor had ordered otherwise. Corroborating the statements made by in the preceding report, it was reported that the bed in Jeraie's room was "just for show when the social worker comes over."

112.     The reporting party further stated that while a DPSS social worker was visiting, Jeraie reached for a quesadilla that was left out. When the social worker said, "I thought she does not want food," MORRIS-KERIN replied, "oh, she just reaches for everything." Afterwards, MORRIS-KERIN instructed her staff to "never bring food around Jeraie when the social worker is there."

113.     The intake social worker at DPSS noted on the Emergency Response Referral Information that "The client notebook for foster mother and Jeraie, are marked sensitive for reasons unknown."

114.     According to an Emergency Response Referral Information, dated March 18, 2010, DPSS received a report that a 19 year old female who lived in the home of MORRIS-KERIN and KERIN disclosed that "*the older children in the home are sexually abusing and physically abusing the non-verbal children*." Jeraie was specifically listed as a victim in the Emergency Response Referral Information. At all times relevant, Jeraie was non-verbal.

115.     According to said document, the child abuse report was "marked sensitive in CWS" and was a companion referral to another report. For reasons unknown, in the Referral History section, six (6) other entries of other referrals concerning Jeraie were completely redacted, including the referral date and allegation types. Under the notifications section, only the names of DPSS social workers were listed. Despite the obviously criminal nature of

the allegation, it does not appear that DPSS notified any law enforcement agency of the allegations.

116.    The DPSS social workers assigned to the investigation, RANSOM and BURNETT, did not perform a reasonable investigation and closed out said referral as "Unfounded."

117.    Nobody informed Raushanah about this referral or brought the existence of referral to the attention of the Juvenile Court. It was purposefully concealed and suppressed by all defendants.

118.    As a result of Defendants' failure to intercede, investigate, and take action to stop the abuse of Jeraie, the child suffered tremendously. Plaintiffs are informed and believe and thereon allege that Jeraie suffered from: (1) extreme gastrointestinal distress from forced g-tube feeding and misuse of the g-tube that caused rapid decline in her bodily functions, (2) mental and emotional distress associated with dehydration and hunger, (3) extreme physical pain that led to behavioral manifestations of banging and rubbing her head sufficient to cause a bald spot to develop on her head, (4) extreme pain and discomfort from being physically strapped to an confined to a wheelchair, (5) shame and discomfort from sitting in her own feces, (6) fear, loneliness, and anxiety caused by the separation from her family, (7) pain, fear, and disease associated with sexual assault and rape, and (8) extreme physical pain and disease caused by improper medication.

119.    Throughout their lengthy interactions and involvement with Raushanah, Defendants, and each of them, lied to Raushanah about the quality of care received by Jeraie and intimated and threatened Raushanah with removal and/or adoption of her two other children, J.P and Jerone, if Raushanah took any adverse action against them including, but not limited to, by asserting her rights.

### FIRST CLAIM FOR RELIEF

**Violation of Constitutional Rights (Deception in the Presentation of Evidence)**

**(By J.P. and Raushanh, as successor in interest to Jerae, against INDIVIDUAL COUNTY DEFENDANTS, and DOES 1-10.)**

120.     Plaintiffs hereby incorporate herein by reference paragraphs 1 through PARA1 of this Complaint as if set forth in full.

121.     At all times relevant herein, there existed a clearly established due process right of individuals not to be subjected to false accusations by government officials, including the deliberate presentation of false or perjured evidence, and/or by the suppression of exculpatory information in court proceedings or in documents submitted with recommendations or requests made to the court. Any reasonable social services agent and/or government agent in these Defendants' situation would know that it is a fundamental due process violation to lie, exaggerate, fabricate evidence, and/or suppress material exculpatory evidence in court reports and other documents filed with the Juvenile Court.

122.     In fact, these Defendants, and each of them, had the affirmative and self-evident duty and obligation to be truthful, honest, accurate, and complete in petitions, reports, and documents submitted and/or presented to the Juvenile Court which had the power to adjudicate substantial rights, including parental rights. These Defendants, and each of them, also had an affirmative obligation and duty to refrain from using improper, unlawful, and deceptive means to obtain judicial orders sustaining and/or adopting social worker recommendations or otherwise seeking to denigrate Plaintiffs' well-established liberty interests in familial integrity and continued familial association.

123.     At all relevant times, these Defendants, and each of them, were acting under color of law, and within the course and scope of their official duties when they drafted, created, approved, and/or filed documents with the juvenile court.

124.     On information and belief, these Defendants, and each of them, either singularly or jointly acted and/or agreed to deliberately and/or recklessly present false statements and information, and/or omitted known exculpatory material information when creating their various documents for presentation to the Juvenile Court which had the predictable impact of causing J.P.'s detention and prolonging Jeraie's detention from their mother and family, and continuing to delay Jeraie's ability to obtain essential care and services. This conduct, i.e., Defendants' knowingly deceptive presentation of "evidence" to

the Juvenile Court, caused the detention of J.P. and the continued and prolonged detention from Jeraie from their mother and family.

125.    On information and belief, had it not been for these Defendants' deliberate false statements and/or omissions of exculpatory material in the Juvenile Dependence Petition and/or other reports filed in the Juvenile Court, the Juvenile Court would not have adopted Defendants' recommended findings and ordered the detention of J.P. or continued the detention of Jeraie.

126.    On information and belief, as a direct and proximate result of these Defendants' misconduct, Plaintiffs suffered general and special damages according to proof at trial, including but not limited to, physical manifestations of emotional distress, and/or mental anxiety and anguish, among other things.

127.    Due to the malicious, wrongful and despicable nature of the Defendants' misconduct, as herein alleged and described above, Plaintiffs are entitled to recover punitive damages against the INDIVIDUAL COUNTY DEFENDANTS and DOES 1-10, and each of them, in accordance with law and subject to proof at trial.

## SECOND CLAIM FOR RELIEF

**Violation of Constitutional Rights (Failure to Provide Dependent Minor Continued Safety and Security and Minimally-Adequate Care)**

**(By Raushanah, as Successor-In-Interest to Decedent Jeraie Cromartie, against All Defendants)**

128.    Plaintiffs hereby incorporate herein by reference paragraphs 1 through PARA1 of this Complaint as if set forth in full.

## COUNT 1

129.    At all relevant times alleged herein, Defendants, and each of them, were acting within the course and scope of their duties as COUNTY employees and under color of law.

130.    Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and adequate care and supervision.

*Lipscomb by and through DeFehr v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992). The Constitution's Fourteenth Amendment protects a foster child's interest in social worker supervision and protection. *Tamas v. Dep't of Soc. & Health Servs*., 630 F.3d 833, 842-843 (9th Cir. 2010). Thus, once the government assumes custody and care of a child, it owes that child a duty to provide reasonable safety and security, and at least minimally-adequate care and supervision, including but not limited to health care.

131.   Jeraie was a ward of COUNTY was she was ordered to continue to be detained in the COUNTY's care, custody, and control and was therefore owed the duties and protections set out above. See, e.g., *Gerrie v. Cty. Of San Bernardino*, No. EDCV 19-1435 (JGB) (SPx), 2019 U.S. Dist. LEXIS 228051 (C.D. Cal. Nov. 12, 2019); see also, *Garcia v. Cty. Of San Diego*, No. 15-CV-189 JLS (NLS), 2018 U.S. Dist. LEXIS 101718, at *36 (S.D. Cal. June 18, 2018). By virtue of her status as a ward of the COUNTY, Jeraie held protected liberty interests in being shielded from harm inflicted in foster care and enjoyed a special relationship with the COUNTY and each of the remaining Defendants who were charged with the duty to provide, or to participate in providing for her care.

132.   At all times applicable herein, said liberty interest and duties of Defendants, and each of them, was so clearly established that any reasonable person similarly-situated would know it was a violation of Jeraie's fundamental rights to fail to provide for his continued safety and security and to fail to provide her with at least minimally-adequate care and supervision, including reasonably adequate health care.

133.   Moreover, Defendants are liable where their actions create or expose an individual to a danger which he or she would not have otherwise faced. *Henry A. v. Willden*, 678 F.3d 991, 1002 (9th Cir. 2012); *Martinez v. City of Clovis*, 943 F.3d 1260 (9th Cir. 2019). A foster child's due process rights are violated when a state official exhibits deliberate indifference to a child's serious medical needs. Here, Jeraie's health continued to decline throughout her time in the County's custody. Yet, Defendants failed to adequate supervise and monitor Jeraie's care while in the County's custody. Indeed, through these Defendants'

actions and inactions, Jeraie was placed in greater danger than she otherwise would have faced if left with his parents, or if promptly returned to their care.

134.     Further, Defendants were had the duty to regulate and monitor the foster children placed in their care by the Riverside County Juvenile Court pursuant to policies and programs designed, among other things, to protect the legal and human rights of children receiving services from community care facilities, so that they would be equipped, staffed, and supervised to provide at least minimally adequate care and supervision.

135.     During the time Jeraie remained in the care, custody, and control of Defendants, each of the Defendants were deliberately indifferent to Jeraie's obvious and known health care needs. In spite of their legal obligation to meet those needs, Defendants, and each of them, knowingly and with deliberation failed to do so.

136.     Each of Defendants acted with a reckless disregard for and deliberate indifference to Jeraie's known rights and needs by failing to provide for and ensure Jeraie's continued safety and security and by failing to provide at least minimally adequate continued care, including healthcare and supervision, even though they had been notified of his needs on multiple occasions and received numerous reports of suspected child abuse in the foster care placement.

137.     Contrary to their obligations to her, Defendants placed and maintained Jeraie in situations where it was reasonably foreseeable that Jeraie would not receive essential mental/behavioral health services needed to address her known needs – and predictably, she did not receive the care, or the level of care, he obviously needed. In fact, she suffered physical abuse.

138.     They failed to properly investigate at least four referrals for suspected child abuse to include, medical abuse, physical abuse, sexual abuse, and emotional abuse.

139.     Defendants, in spite of their knowledge of Jeraie's declining condition, maintained Jeraie in inappropriate and inadequate placement for a prolonged period of time knowing that she was not receiving necessary or appropriate health services and/or

COMPLAINT FOR DAMAGES

supervision to address her substantial healthcare needs. In fact, Defendants allowed Jeraie to be slowly tortured to death.

140.    These Defendants, and each of them, knew or with the exercise of reasonable care should have known, that Jeraie presented with a high risk of foreseeably suffering serious health complications, and even death, if not provided with appropriate care supervision and treatment. Despite this, these Defendants, and each of them: (1) failed to reasonably and/or adequately investigate allegations that Jeraie was mistreated or inadequately cared for in the home of MORRIS-KERIN and KERIN, (2) ignored and failed to inform the court of the potential reasons for Jeraie's declining condition, including potential abuse, (3) allowed Jeraie to remain in inadequate and inappropriate care without needed and essential healthcare and supervision, and, (4) failed to take steps to ensure that Jeraie actually did receive the care and supervision she required to even survive.

141.    As a direct and proximate result of Defendants' acts and omissions, Jeraie suffered injuries as alleged herein, including but not limited to injuries to his person, which injuries include pain, humiliation, anxiety, mental anguish, emotional distress, up to and including her death and other general and special damages in an amount to be ascertained according to proof at trial.

142.    Due to the malicious and knowing violation of Jeraie's rights and/or the wanton disregard of her rights, and the wrongful and despicable nature of the Defendants' misconduct, as herein alleged and described above, Raushanah, as successor in interest, hereby demands and is entitled to recover punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

### COUNT 2

143.    On information and belief, the COUNTY, on the one hand, and MORRIS-KERIN, KERIN, and LIFEPLAN, on the other hand, entered into a contract to provide child care and social services to children in the COUNTY's custody. On information and belief, these Defendants collaborate to provide child care and social services to children in the COUNTY's custody as well as other traditional government services. On information and

belief, at all relevant times, these Defendants' agents and employees operated pursuant to Defendants respective child care contracts.

144.   MORRIS-KERIN, KERIN, LIFEPLAN, and each of them, jointly and willfully collaborated with the COUNTY to provide child care and social services to Jeraie.

145.   Pursuant to contract, these Defendants' agents and employees assumed custody and care of Jeraie. These Defendants' agents and employees enjoyed a special relationship with Jeraie such that their employees, who are also identified herein as Defendants were charged with the affirmative obligation, that is, the duty to ensure Jeraie's safety and protection, and provide her with minimally adequate care, including healthcare and supervision.

146.   These Defendants, including their employees who are also identified hereinabove as Defendants knew that Jeraie suffered from congenital defects, disabilities, was not ambulatory, was not verbal, and utterly dependent on others for her health and wellbeing. It was also reasonably foreseeable that failure to provide Jeraie's medical care providers with accurate information regarding the child's symptoms, failing to follow doctor's recommendations, overmedicating or giving the wrong medication to Jeraie, exclusively using a g-tube to provide nutrients, depriving the child of access to food and water, strapping the child to a wheelchair for prolonged periods of time, failing to administer pain medication, committing or allowing the sexual abuse of the child, among other things, is a total and complete failure to provide adequate protection, supervision, and safety.

147.   These Defendants, including their employees who are also identified hereinabove as Defendants, and each of them, refused and/or failed to supervise Jeraie, implement or set up safeguards to protect Jeraie, provide minimally adequate care, and/or ensure that Jeraie received adequate supervision and health care. They actively committed medical, physical, mental, and/or sexual abuse of Jeraie.

148.   These Defendants conduct, including that of their employees who are also identified hereinabove as Defendants, was a substantial factor in causing Jeraie to suffer serious harm, including death. As a direct and proximate result of these Defendants conduct,

including their employees who are also identified hereinabove as Defendants, Jeraie's

constitutional rights were violated; and, he suffered damages thereby, as according to proof at

trial.

149.     These Defendants conduct, including that of their employees who are also

identified hereinabove as Defendants, as herein alleged was intentional and/or undertaken

with a conscious disregard for Jeraie's rights. As a result of this misconduct, Plaintiffs, as

Jeraie's successors in interest, are entitled to recover punitive damages against each of these

defendants for the role they played.

### THIRD CLAIM FOR RELIEF

**Violation of Constitutional Rights (Wrongful Seizure of Child)**

**By J.P. against GARCIA, JULIAN, SOUZA, and DOES 1-10, inclusive.**

150.     Plaintiffs hereby incorporate herein by reference paragraphs 1 through

PARA1 of this Complaint as if set forth in full.

151.     At all times relevant to this Complaint, J.P. had a clearly established right to

familial association, such that a reasonable social worker in Defendants' situation would

know it is unlawful to remove a child from the care, custody, and control of his parent based

on a custody warrant procured through the presentation of fabricated evidence and

concealment of exculpatory facts.

152.     Moreover, the right to familial association guaranteed under the First, Fourth,

and Fourteenth Amendments to the United States Constitution was so clearly established that

any reasonable law enforcement agent, including each of the Defendants, would know that it

is unlawful to continue to detain a child from the custody of her parent when that agent

knows, or has reason to know, that there is no legal or factual basis for the continued

detention.

153.     Defendants, and each of them, had, at all times relevant herein, an affirmative

duty and obligation to recognize and conduct themselves in a manner that confirms, provides

for, and does not violate the protections guaranteed Plaintiffs under the United States

Constitution, including those under the Fourteenth Amendment, to include without

limitation, the protection of parental rights, the right to privacy, family integrity and the right to familial relations.

154.     As alleged hereinabove, Defendants procured a custody warrant for J.P. based on false and fabricated evidence and concealment of exculpatory facts contained in the Detention Report and Juvenile Dependency Petition, among other things.

155.     At the time each misrepresentation was made, Defendants knew the statements were not true or acted in reckless disregard of the truth by including representations for which they had no knowledge were true or false or a misrepresentation of facts. At the time of each concealment of material fact, said Defendants knew that they were not telling the complete truth with the object of misleading the Superior Court of California to issue a warrant.

156.     As a result of Defendants fraudulent and perjured statements, J.P. was separated from his mother, Raushanah.

157.     As a direct and proximate result of Defendants' misconduct, J.P. suffered general and special damages according to proof at trial.

158.     Due to the malicious, wrongful and despicable nature of the Defendants' misconduct, as herein alleged and described above, J.P. is entitled to recover punitive damages against Defendants and DOES 1-10, and each of them, in accordance with law and subject to proof at trial.

### FOURTH CLAIM FOR RELIEF

#### *Monell*-Related Claims

#### By All Plaintiffs against COUNTY

159.     Plaintiffs hereby incorporate herein by reference paragraphs 1 through PARA1 of this Complaint as if set forth in full.

160.     COUNTY is a "person" within the meaning of 42 U.S.C. § 1983 and subject to *Monell* liability under *Monell v. Dept. of Social Services* (1978) 436 U.S. 658. Defendants, and each of them, acted under color of state law when committing the acts alleged herein, in violation of Plaintiffs' rights.

161.    COUNTY, including through its DPSS entity, had a duty to Plaintiffs at all times to establish, implement and follow policies, procedures, customs and/or practices which respect citizens constitutional rights guaranteed as in this case to Plaintiffs under the United States Constitution, including those rights derived from the Fourth and Fourteenth Amendments.

162.    Plaintiffs allege that COUNTY breached said duty by failing to implement proper policies in the face of a known need, failed to train and supervise its agents, failed to audit and correct constitutionally deficient policies and widespread practices, failed to discipline its agents employees that violated the constitutional rights of parents and children, and had a widespread practice of violating the rights of children and parents in the same or similar manner described in this Complaint.

163.    These alleged failures of the COUNTY were the moving force behind the alleged violations of civil rights herein, and the direct and proximate cause of Plaintiffs' injuries, as alleged herein. As a result, Plaintiffs have sustained general and special damages to an extent and in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### Wrongful Death

### (By Raushanah, individually and as Successor-In-Interest to Decedent Jeraie Cromartie against All Defendants)

164.    Plaintiffs hereby incorporate herein by reference paragraphs 1 through PARA1 of this Complaint as if set forth in full.

165.    Jeraie was a dependent of COUNTY at the time that she suffered the abuse, mistreatment, and neglect herein alleged. At all times relevant, COUNTY was under the custody, supervision, care and control of COUNTY and, as such, Defendants assumed mandatory statutory duties arising under state law, to provide for the continued safety and security of the child and to provide at least minimally adequate care, including timely healthcare.

166.    Plaintiffs detrimentally relied upon the COUNTY to provide for Jeraie's care, health, welfare, safety and well-being. Plaintiffs further detrimentally relied upon the acts or omissions of all Defendants, to fulfill their duties, which included the duty and responsibility (1) to supervise the foster care, (2) to supervise foster children that DPSS placed in foster care, (3) to provide adequate care, (4) to not abuse or neglect the child, and (5) to properly investigate any reports of abuse occurring in the foster care placement.

167.    The acts and/or omissions of Defendants, and each of them, including but not limited to by improperly placing Jeraie into foster care that was not well suited for Jeraie's medically fragile needs and/or run by operators who had a history of complaints of abuse and medical mistreatment of foster children, failing to investigate complaints of child against Jeraie while in foster care, failing to supervise and audit the foster care facility, created a substantial and foreseeable risk to Jeraie of serious harm.

168.    In addition, defendants, including MORRIS-KERIN, KERIN, and LIFEPLAN are directly responsible damages proximately caused by their commission of mental, physical, medical, and sexual abuse of the child Jeraie, including, but not limited to, by failing to follow doctors' orders, by falsifying information presented to health care providers, by forcing the use of a g-tube exclusively and setting misusing the feeding machine to cause gastrointestinal damage, by overmedicating or improperly medicating Jeraie, by sexually abusing or allow Jeraie to be sexually abused, confining Jeraie to a wheelchair, and by depriving Jeraie of access to food and water.

169.    Defendants, and each of them, through the exercise of reasonable care should have known that Jeraie was not safe in the home of MORRIS-KERIN and KERIN and was the victim of abuse and neglect.

170.    As a direct and indirect result of the acts and omissions of Defendants, and each of them, as herein alleged, Jeraie sustained severe and serious injuries resulting in his death as alleged herein above.

171.    As a direct and legal result of the conduct of the Defendants, and each of them, and of the death of Jeraie, Plaintiffs have suffered both special and general damages,

including but not limited to funeral and burial expenses and loss of the society, companionship, comfort and support of their son Jeraie, in an amount to be shown according to proof at trial.

### SIXTH CLAIM FOR RELIEF

**Breach of Mandatory Duties**

**(By Raushanah, individually and as Successor-In-Interest to Decedent Jeraie Cromartie, against INDIVIDUAL COUNTY DEFENDANTS and DOES 1-10, inclusive)**

172.    Plaintiffs hereby incorporate herein by reference paragraphs 1 through PARA1 of this Complaint as if set forth in full.

173.    Pursuant to California Penal Code Section 11165.7 and other provisions of the California Child Abuse and Neglect Reporting Act ("CANRA"), Defendants, including, but not limited to, SIMON, RANSOM, THRONE, BURNETT, ROMERO, and SANDERS were "mandated reporters" with regard to any reasonable suspicion of child abuse or neglect, including in a foster home.

174.    Defendants, and each of them, knew or should have known that Jeraie was subjected to repeated physical/sexual/medical abuse and/or severe neglect while in the care of MORRIS-KERIN, KERIN, and LIFEPLAN, and this gave rise to a duty to report this knowledge and suspicion to, among other persons, law enforcement and the District Attorney's Office. Defendants failed to make such reports and failed to remove Jeraie from foster care.

175.    Had Defendants properly notified law enforcement and/or the District Attorney's office, an investigation could have lead to an investigation that would have put an end to Jeraie's suffering and abuse at the hands of MORRIS-KERIN, KERIN, and LIFEPLAN.

176.    Instead, Defendants failed to conduct a proper investigation and failed to follow the procedural requirements of CANRA with regard to the investigation and disposition of child abuse referrals.

177.     Pursuant to California Government Code Section 815.2 and 820, the INDIVIDUAL COUNTY DEFENDANTS are liable for violating CANRA and the COUNTY is vicariously liable for the same.

178.     In addition, Defendants, and each of them, continuously violated mandatory duties including, but not limited to, those duties imposed under the California department of Social Services (CDSS) Manual of Policies and Procedures (MPP) established pursuant to California Welfare & Institutions Code §16501 and as set forth in the written policies of the County of Riverside.

179.     Plaintiffs allege that specific statutes, regulations and policies violated by Defendants include, but are not limited to:

 a. Regulation 31-125, by failing to make necessary collateral contacts with each person having knowledge of the condition of each child that is the subject of an allegation;

 b. Regulation 31-135, by not removing Jeraie from the care of MORRIS-KERIN and KERIN;

 c. Regulation 31-135, by falsifying and/or documenting pre-placement preventative efforts to avoid detention;

 d. Regulation 31-137, by failing to provide needed transitional medical and health treatment and adequate supervision to Jeraie;

 e. Regulation 31-201, by failing to complete an adequate assessment of Jeraie's needs and failing to develop an appropriate case plan to address Jeraie's needs and by failing to implement even the inadequate case plan that was eventually developed;

 f. Regulation 31-205, by failing to properly document an assessment of Jeraie and/or conduct such an assessment;

 g. Regulation 31-206, by failing to properly document a case plan for Jeraie;

COMPLAINT FOR DAMAGES

h.  Regulations 31- 210 and/or 31-215, by failing to comply with the case plan time frames and administrative requirements and failed to complete a case plan within 30 calendar days of Jeraie's removal as required;

i.  Regulations 31-225 and/or 31-230, by failing to update case plan documentation;

j.  Regulation 31-310 by failing to monitor Jeraie's medical needs, care and supervision as well as her condition and by failing to provide services appropriate to meet those needs and by failing to assist Raushanah to understand agency procedures and orders of the court;

k.  Regulation 31-315, by failing to maintain continuity of mental health care for Jeraie despite actual knowledge of his severe, substantial, and serious healthcare needs;

l.  Regulation 31-320, by not complying with the social worker contact requirements with Jeraie;

m.  Regulation 31-325, by not complying with the social worker contact requirements with Rasuhanah;

n.  Regulation 31-330, by not complying with the social worker contact requirements with the out-of-home care providers; and

o.  Regulation 31-335, by failing to comply with the social worker contact requirements with other service providers.

180.  In addition to all of the foregoing, Defendants' placement of Jeraie in facilities inadequately trained and not capable of meeting her needs and providing an environment suitable and appropriate to meet Jeraie's needs violated Regulations 31-401 through 31-445 of the CDSS Manual of Policies and Procedures by failing to fulfill the social worker responsibilities for placement.

181.  Defendants also failed to fulfill the statutory duties imposed upon social workers regarding placement, giving preferential consideration for placement of Jeraie with a grandparent, aunt, uncle or other family member, failing to adequately conduct face-to-face

contacts with Jeraie, failing to investigate and report reports of neglect and abuse of Jeraie, and failing to provide adequate supervision, adequate services, and taking necessary actions to safeguard Jeraie's health and development while in foster care placement.

182.    The foregoing list is not exhaustive and is subject to amendment based on subsequently discovered evidence.

183.    Defendants breached their duties to Plaintiffs by failing to adhere to the mandatory duties imposed upon them. As the proximate result of Defendants' failure to fulfill their duties, Jeraie suffered neglect, abuse, and/or mistreatment from the date that he was first taken and continuing through the date of her death.

184.    Plaintiffs suffered special and general damages as a result of the acts and omissions of Defendants which ultimately caused or substantially contributed to the death of Jeraie.

185.    As a direct result of the acts and omissions of Defendants, Plaintiffs and Jeraie sustained general and special damages in amounts within the jurisdictional limits of this Court and to be determined according to proof at trial.

## SEVENTH CLAIM FOR RELIEF

### Breach of Duties Imposed Under Special Relationship

### (By Raushanah, individually and as Successor-In-Interest to Decedent Jeraie Cromartie, against All Defendants)

186.    Plaintiffs hereby incorporate herein by reference paragraphs 1 through PARA1 of this Complaint as if set forth in full.

187.    A special relationship was established between Defendants and Jeraie and similarly-situated minors, under which Defendants, and each of them, owed Jeraie and similarly-situated minors a duty of due care and a duty to protect Jeraie from foreseeable harm.

188.    COUNTY has primary jurisdiction and control of the County of Riverside foster care system including, but not limited to, individuals and facilities established, regulated, licensed, and controlled under the Community Care Facilities Act.  Defendants

COUNTY and DOES 1 through 10, inclusive, have primary jurisdiction over the placement, protection and care of juveniles in the custody of COUNTY while they are in foster care.

189.    Plaintiff alleges that Defendants COUNTY and DOES 1 through 10 maintain primary jurisdiction, control, and responsibility for the health, safety, protection, and well-being of juveniles while they are in custody, which is co-extensive with the entities and individuals to which it delegates authority, including group homes and other community care facilities.

190.    COUNTY has the primary jurisdiction and a continuing responsibility to investigate the background, history and qualifications of all persons who provide foster care, or who own, operate, or are employed by community care facilities, to insure the health, safety, well-being and protection of minors placed into foster care. Plaintiffs reasonably relied on COUNTY to perform its continuing duty to ensure the qualifications of persons and agencies providing care and the ability of those persons and agencies to meet the needs of the minors placed with them.

191.    Jeraie was a detained minor of the Riverside County Juvenile Court and was in the custody, supervision, care and control of COUNTY for the purpose of providing care, supervision and control of the minor's health, welfare, safety and care. At the time she was detained the rights, duties and responsibilities of Jeraie's parents or guardians were suspended, and such duties and obligations were assumed by COUNTY, and such individuals or entities to whom it delegated such duties. Plaintiffs therefore relied upon COUNTY to perform its oversight, quality of care inspections, and other duties, and upon the DPSS and/or private foster care providers and agencies with whom it contracts, to provide such supervision and control over his health, welfare, safety and care. As a result a special relationship was thereby established between Defendants and both Raushanah and Decedent.

192.    Defendants, and each of them, knew or should have known that Jeraie's medical needs were not being met while in the care of MORRIS-KERIN and KERIN, and that Jeraie was suffering medical, physical, mental, and/or sexual abuse while in foster care. It was foreseeable that Jeraie would be damaged as a result.

193.     Despite this continuing constructive and actual notice of the needs of Jeraie and the inappropriateness and inadequacy of the services and placements provided, COUNTY allowed the inappropriate placements and inadequate services to be maintained and continued.

194.     Despite the existence of the special relationships between Defendants and Plaintiffs, Defendants breached their respective duties of due care under the special relationship while in the scope of their agency or employment, by failing and neglecting to fulfill or perform their respective duties to control, monitor, care for and protect the health, safety and well-being of Jeraie and other minors in custody while in foster care.

195.     Government Code §820 provides that an employee of a public entity is liable for his or her acts or omissions to the same extent as a private person, and under Government Code §815.2 the public entity that employs the individual is vicariously liable for the torts of its employee committed in the scope of employment.

196.     As a proximate result of the breach of duty of due care under the respective special relationships created and existing between Defendants, Plaintiff and Decedent, Plaintiff individually and Decedent suffered injuries and damages as alleged herein. Jeraie suffered neglect and mistreatment, which was reasonably obvious and foreseeable and could, should, and/or would have been discovered in the exercise of due care including, but not limited to, by investigating reports of suspected child abuse, by communicating with mental health professionals and medical care providers, by adhering to COUNTY procedures and policies, by conducting in-person interviews and by other established methods and procedures for the supervision, care and oversight of dependent minors while in foster care.

197.     Plaintiffs allege that Defendants, and each of them, failed and neglected to establish and implement policies and procedures to ensure the health, safety and well-being of Jeraie and other minors, including, but not limited to, the failure to develop and institute policies and procedures for conducting periodic examinations, in-person interviews, obtaining second opinions, and other methods designed to discover and prevent physical,

psychological and unlawful physical and/or psychological abuse, neglect and mistreatment of minors in custody, including Jeraie.

198.     Had Defendants, and each of them, not breached their respective duties of due care under their special relationships, they could, should, or would have discovered evidence of neglect and mistreatment of Jeraie, or of the unfitness of her service providers to accommodate her mental health condition and needs and taken measures to protect Jeraie from foreseeable harm.

199.     As a proximate result of the acts and omissions of Defendants, and each of them, Plaintiff and Decedent sustained general and special damages as alleged herein, in amounts within the jurisdictional limits of this court according to proof at trial.

### EIGHTH CLAIM FOR RELIEF

### Negligence

### (By Raushanah, individually and as Successor-In-Interest to Decedent Jeraie Cromartie, against All Defendants)

200.     Plaintiffs hereby incorporate herein by reference paragraphs 1 through PARA1 of this Complaint as if set forth in full.

201.     At all relevant times, Defendants, and each of them, were acting within the course and scope of their duties.

202.     At all relevant times, Defendants, and each of them, owed statutory, regulatory, and generally accepted duties of care to Jeraie. Namely, Defendants, and each of them, had a duty to watch after and/or care for Jeraie, and ensure her safety while charged with his care and/or supervision.

203.     Pursuant to contract with COUNTY, MORRIS-KERIN, KERIN, LIFEPLAN, and DOES 1 through 10 assumed custody and care of Jeraie and as such owed her a special duty of care.

204.     COUNTY, INDIVIDUAL COUNTY DEFENDANTS, MORRIS-KERIN, KERIN, LIFEPLAN, and DOES 1 through 50 knew, or with the exercise of reasonable care should have known, that Jeraie required special attention and supervision to care to feed,

bathe, and thrive, because Jeraie suffered from congenital delays, disabilities, was non-verbal, was non-ambulatory, and suffered from serious medical conditions requiring special care.

205.    Defendants refused and/or failed to supervise Jeraie, implement or set up safeguards to protect Jeraie, provide minimally adequate care, and/or supervision to ensure that Jeraie was well taken care of and that his medical needs were met.

206.    Defendants did not provide Jeraie even minimally adequate supervision, care, safety and security and thereby breached their respective duties of care to Jeraie.

207.    Jeraie's heath and welfare predictably declined and continued to decline until her death as a result of Defendants lack of attention to her needs and general breach of their obligations to care for her.

208.    As a direct and proximate result of Defendants' breach of their duties to Jeraie, she sustained physical injuries, to an extent and in an amount subject to proof at trial. Jeraie also sustained psychological, mental, and/or emotional injuries, to an extent and in an amount subject to proof at trial.

209.    Defendants' acts and/or omissions were a substantial factor in causing harm to Plaintiffs.

210.    Defendants, and each of them, are vicariously responsible for the conduct of each of the remaining Defendants under Government Code Section 815.2 and/or other applicable law.

## NINTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

### (By Raushanah, individually and as Successor-In-Interest to Decedent Jeraie Cromartie, against All Defendants)

211.    Plaintiffs hereby incorporate herein by reference paragraphs 1 through PARA1 of this Complaint as if set forth in full.

212.    The conduct of these Defendants, and each of them, was extreme and outrageous in that they abused their position of authority and their relationship with Plaintiffs

and Jeraie. The relationship between Plaintiffs and Defendants, and each of them, was such that the Defendants, and each of them had real, or apparent, power to affect all of Plaintiff's interests.

213.    At all relevant times after Jeraie removal from Raushanah and her repose in the custody of COUNTY, Defendants, and each of them, subjectively knew that Jeraie, and Plaintiffs were particularly vulnerable to emotional distress. Moreover, Defendants, and each of them, knew that their conduct would likely result in physical and/or emotional harm due to mental distress, among other things.

214.    Plaintiffs, up until the moment of Jeraie's death and after, suffered the severe and obvious emotional distress that results from the mistreatment suffered by Jeraie as well as the emotional distress one might be expected to suffer as a result of the death of one's child under the circumstances presented here.

215.    Defendants' conduct in failing to adequately monitor and supervise Jeraie while he was in the COUNTY's care was extreme and outrageous. Defendants placed Jeraie in foster care where they failed to provide to provide necessary health services, investigation, and supervision to ensure Jeraie's safety and survival. As Jeraie was unable to care for himself, Defendants' multiple repeated and knowing failures and led, inevitably, to Jeraie suffering medical/physical/mental/sexual abuse and decline in health and death.

216.    Defendants, as part of their duties and responsibilities, knew, or reasonably should have known, that adequate services, monitoring, investigation, and supervision were absolutely essential.

217.    Defendants, and each of them, acted with reckless disregard of the probability that Plaintiffs, including Jeraie, would suffer emotional distress in that they gave little or no thought to the probable effects of their conduct; and, as a direct and proximate result of Defendants' conduct, Plaintiffs, including Jeraie, did suffer severe emotional distress. The conduct of Defendants, and each of them was a substantial factor in causing the severe emotional distress suffered by Plaintiffs and Jeraie up until the moment of his death.

218.   INDIVIDUAL COUNTY DEFENDANTS at all times were acting within the course and scope of their duties as employees of COUNTY. Thus, COUNTY is vicariously responsible, and liable, for all damages naturally flowing from the misconduct of the remaining Defendants in an amount according to proof at trial.

219.   As a direct and proximate result of these Defendants' misconduct, Plaintiffs have suffered, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety and anguish.

220.   The acts and omissions of the individual and non-governmental Defendants, and each of them, as herein alleged were intentional and/or done with a conscious disregard for Plaintiffs' rights. Because the non-governmental Defendants acted with a wanton and reckless disregard of Plaintiffs' and Jeraie's obvious and known rights, Plaintiffs are entitled to recover punitive damages against these Defendants as according to proof at trial. Plaintiffs expressly make no claim for punitive damages against County.

## **JURY DEMAND**

221.   Plaintiffs demand a jury trial as to all issues so triable.

/ / /

/ / /

/ / /

COMPLAINT FOR DAMAGES

## **PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendants, as to all claims, as follows:

1.     General damages and special damages according to proof at trial, in no event less than $50,000,000.00;

2.     As against the individual defendants, punitive damages as allowed by law;

3.     Attorney's fees pursuant to 42 U.S.C. §1988, and any other appropriate statute;

4.     Costs of suit incurred herein; and

5.     Such further relief as the Court deems just and proper.


Dated: 8/9/2022                                LAW OFFICE OF SAMUEL H. PARK, APC


                                    By:     /s/ Samuel H. Park
                                            Samuel H. Park,
                                            Attorney for Plaintiffs

COMPLAINT FOR DAMAGES